UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:

WAYNE GALE WICKARD,                              Case No. DK 07-09010
                                                 Hon. Scott W. Dales
            Debtor.                              Chapter 7
_____/

GENERAL ELECTRIC CAPITAL
CORPORATION,

            Plaintiff,                           Adversary Proceeding
                                                 No. 08-80498
v.

WAYNE WICKARD,

            Defendant.
_____/


**OPINION AFTER TRIAL**


I. <u>INTRODUCTION</u>

General Electric Capital Corporation ("GECC" or "Plaintiff") contends that Chapter 7 debtor Wayne G. Wickard ("Mr. Wickard" or "Defendant") knowingly and fraudulently made misstatements under oath in his bankruptcy schedules and statement of financial affairs by omitting significant transactions, failing to disclose assets, and undervaluing others, in order to retain the benefits of his prepetition property for himself, his girlfriend, and their various commercial enterprises. GECC also contends that Mr. Wickard failed to keep adequate prepetition records from which his creditors or the trustee might ascertain his financial condition. Based upon these alleged failures, GECC filed a complaint objecting to Mr. Wickard's discharge.

Mr. Wickard concedes many of the historical facts that GECC alleges, including that his schedules and statement of financial affairs omitted various assets and transactions, but he denies any fraud or improper motives in connection with these admitted shortcomings. He contends, further, that his prepetition records adequately reflect his financial dealings in a manner that would permit satisfactory investigation, and in fact, that the Chapter 7 trustee thoroughly reviewed his financial affairs.

The court held a bench trial over three days in Kalamazoo, Michigan, to consider whether to withhold Mr. Wickard's discharge under 11 U.S.C. § 727(a)(3) or (a)(4).  Because the court finds that Mr. Wickard fraudulently and intentionally made false oaths in connection with this bankruptcy case, it will enter judgment for GECC, denying Mr. Wickard's discharge.  The following constitutes the court's findings of fact and conclusions of law supporting this decision, in accordance with Fed. R. Bankr. P. 7052 and Fed. R. Civ. P. 52.

## II. JURISDICTION

Pursuant to 28 U.S.C. § 1334(a), the court has jurisdiction over Mr. Wickard's bankruptcy case, which has been referred to the court under 28 U.S.C. § 157(a) and LCivR 83.2(a) (W.D. Mich.).  Because GECC's complaint seeks an order denying a discharge, the adversary proceeding is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)—one in which the court may enter final judgment, subject to appellate review under 28 U.S.C. § 158.

## III. ANALYSIS

Not every Chapter 7 debtor is entitled to discharge his debts because, generally speaking, only "the honest but unfortunate debtor" merits the bankruptcy court's protection. *Grogan v.*

*Garner*, 498 U.S. 279, 287 (1991).  This familiar bankruptcy axiom finds its statutory expression in 11 U.S.C. § 727(a), which provides, in relevant part, as follows:

> The court shall grant the debtor a discharge, unless--
>
> . . .
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
> (4) the debtor knowingly and fraudulently, in or in connection
>
> with the case—
>
> (A) made a false oath or account . . .

11 U.S.C. § 727(a).  The statute simply recognizes that in order to merit a discharge, a debtor must keep financial records and must fully and frankly disclose financial information so that interested parties can evaluate the property available to satisfy claims, assess possible grounds for objecting to claims and exemptions, and determine the debtor's fitness for a discharge.

Although the trial testimony and exhibits referred to numerous corporate enterprises, Mr. Wickard's involvement with Northeast Indiana Truck Center, LLC ("NEITC"), Diversified Management Services, LLC ("DMS"), Phoenix Capital, Inc. ("Phoenix"), Sterling Insurance Management, Inc. ("Sterling Insurance"), and Advantage Properties, LLC ("Advantage") have the most direct bearing on this proceeding because GECC argued that Mr. Wickard did not disclose transfers involving these entities, or the full extent of his ownership and management interests in these companies as the Bankruptcy Code requires.

More specifically, 11 U.S.C. § 521(a)(1) requires Mr. Wickard to file a list of creditors, schedule of assets and liabilities, and a statement of financial affairs, among other documents. Pursuant to statutory authority,[1] the Supreme Court has prescribed rules and forms governing bankruptcy practice, including the two forms principally at issue in this case, Official Form 6B ("Schedule B") and the Statement of Financial Affairs ("SOFA"). By signing his Declaration Concerning Debtor's Schedules, Mr. Wickard attested to the accuracy of Schedule B and his SOFA, under penalty of perjury.[2] This act of swearing forms the predicate of GECC's case under 11 U.S.C. § 727(a)(4). Because the Debtor has not admitted fraudulent intent in preparing his schedules and statements, GECC's case depends upon the court's drawing inferences from the surrounding circumstances established at trial. *In re Keeney*, 227 F.3d 679, 685-86 (6th Cir. 2000).

A.      Record Keeping Failures: § 727(a)(3)

Under § 727(a)(3), a plaintiff must prove that a debtor failed to "produce records that provide 'enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period  . . . .'" *Union Planters Bank, N.A. v. Connors (In re Connors)*, 283 F.3d 896, 899 (7th Cir. 2002). Here, GECC contends that Mr. Wickard either failed to document a number of important transactions, or that he failed to produce documentation substantiating them.

The testimony established that Mr. Wickard and his affiliates employed a staff of in-house book-keepers for day-to-day accounting services, led by Michele Davis ("Ms. Davis").

---

[1] *See* 28 U.S.C. § 2075.
[2] The Declaration contains the following warning to debtors: "Penalty for making a false statement or concealing property: Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571." Mr. Wickard's Declaration, Schedule B, and SOFA are included as part of Plaintiff's Exhibit 136.

Page 5 of 19

Primarily for tax-reporting, he also engaged an outside accounting firm, Craighead, Lange and Hough, led by Robert Lange, III ("Mr. Lange"), a certified public accountant.   From the voluminous documentary evidence including numerous trial balances, spreadsheets, financial statements, and similar paperwork, it might be tempting to assume that Mr. Wickard kept and supplied copious records, thereby precluding GECC's success under § 727(a)(3).   The court, however, views the record differently because, notwithstanding the magnitude of financial records filling nearly six banker-boxes, the records are deficient in several important respects.

For example, the records do not include documentation of Mr. Wickard's supposed transfer of his interest in certain promissory notes (the "Western Star Notes") to DMS, and the subsequent transfer of his interest in DMS to his girlfriend, Jeanne Romero ("Ms. Romero"). The outstanding balance on these notes, at the time of the transfer, was approximately $270,000.00, and the evidence established that the payors made payments like clockwork. *See* Exh. 19 (DMS balance sheet as of March 31, 2007) & 31 (DMS balance sheet as of September 30, 2008).   Similarly, evidence established that OORC Leasing, LLC ("OORC") owed Mr. Wickard approximately $230,000.00 on account of a "note," which was never produced, but which is nevertheless reflected on DMS's balance sheets. From the reduction in the balance of the OORC note on the DMS balance sheet from $227,746.38 in March 2007 to $149,717.04 in September 2008, the court infers that OORC was similarly making substantial payments, or otherwise giving value on account of the "note" that Mr. Wickard transferred into DMS at its formation in early 2007.

The Western Star Notes figured prominently during trial, but neither party introduced any documentation (other than ledger entries in unaudited books) demonstrating any assignment. These notes were important in part because the evidence established that the payors consistently

remitted $3,475.00 each month to Mr. Wickard before and after his bankruptcy filing, even though Mr. Wickard claimed he had assigned them in early 2007. Similarly, the record does not include any evidence of the OORC note, other than references as entries in the DMS balance sheets and general ledgers. Likewise, Mr. Wickard's transfer of his interests in DMS to Ms. Romero is not evidenced in any contractual documents between the parties.

GECC contends that this lack of documentation impeded efforts to understand Mr. Wickard's financial situation during the relevant period because the transfers were part of Mr. Wickard's efforts to protect his assets after GECC sued him on his $3.7 million commercial guaranty. The court agrees.

Similarly, the record does not include any documentation surrounding the transfers of Mr. Wickard's "book of business," first into NEITC and later into DMS. Mr. Wickard's book of business is akin to a customer list or insurance renewals or expirations constituting an insurance agency's book of business. This book contained a list of commercial relationships crucial to Mr. Wickard's core business, which the parties referred to as "PEO" business—short for "professional employer organizations." The PEO subsidiaries included among the "Wickard Companies,"[3] were entities that performed payroll, employment tax, workers' compensation, and insurance benefit administrative services for customer companies too small to handle such employer functions. In exchange for these employment-related services, the PEO customers would remit funds to the PEO subsidiaries of the Wickard Companies, who would in turn pay the PEO customers' payroll, and remit their employment taxes and insurance premiums. The PEO subsidiaries would also withhold a fee from which they would pay "residuals" or commissions to their own salesmen (including Mr. Wickard) who maintained the relationships with the PEO

---

[3] The term "Wickard Companies" is the informal moniker Mr. Wickard says he adopted to advance his philanthropic goals in his community. According to his testimony, the term does not refer to a formal, separate entity but it is, however, a convenient label to describe the group of companies through which Mr. Wickard conducted business.

customers.    The evidence shows that the commercial relationships in these businesses, created and maintained by Mr. Wickard over many years, as well as the funds derived from them, were the lifeblood of Mr. Wickard's commercial enterprise.

The financial records of NEITC and DMS show that the book of business yielded in excess of $1 million to NEITC and DMS, including commissions to Mr. Wickard on account of his "residuals," during the year before filing. *See* Exh. 156 at p. 018361 & 22 at p. 96015.

Mr. Wickard testified that the PEO customers would generally "park their business" wherever he directed.  To wit, Mr. Wickard told his customers to obtain PEO services from a company referred to as "ELS" until it stopped paying him commissions, at which time he became concerned about ELS's financial viability.  To protect his PEO customers and the residual income-stream flowing from the PEO business, Mr. Wickard moved the book of business from ELS to NEITC until he could make other arrangements.  For a short time, NEITC performed the administrative services associated with Mr. Wickard's PEO business until he formed DMS and named his girlfriend as an officer. He took these steps just before transferring the book of business to DMS and shortly after GECC sued him on a $3.7 million guaranty.

At trial, Mr. Wickard attempted to downplay the significance of his book of business by suggesting that PEO customers could change their minds about working with him or his entities. The court is not persuaded that the possibly fickle nature of customers means the book of business is something less than "property," particularly given the value Mr. Wickard and the Wickard Companies derived from it. Despite the amorphous or intangible nature of the commercial relationships, the court concludes that Mr. Wickard had valuable property rights in the book of business which he transferred between NEITC and DMS within a year of his bankruptcy petition. Regardless of whether the court classifies it as an account or general

intangible within the meaning of the Uniform Commercial Code, it nevertheless qualifies as valuable commercial property. *See, e.g., In re U.S. Ins. Grp., LLC*, 429 B.R. 903, 915 (E.D. Tenn. 2010) (Edgar, J.).

Furthermore, Mr. Wickard established that he controlled and transferred the book of business from entity to entity whenever it suited his purposes. Nevertheless, the record did not include any documentation regarding the transfer from NEITC to DMS.

In defending against the § 727(a)(3) allegations involving inadequate record-keeping, Mr. Wickard pointed to several bankers' boxes of financial documents and relied on the book entries that his in-house bookkeeper, Ms. Davis, prepared for him and his companies. Although the exhibits included an impressive amount of information, much of it appeared unreliable and inaccurate in several respects crucial to the creditors and the trustee of Mr. Wickard, as opposed to his entities. For example, Mr. Wickard disavowed the accuracy of many paid in capital accounts evidently reflecting his equity interest in various entities. Unfortunately, other than the book-keeping entries themselves, the record contains no documents from which the parties or the court might discern a complete understanding of his commercial holdings. *See, e.g.,* Exh. 407, 435, 441 & 446. Similarly, the court never got a satisfactory explanation concerning the source of funds in, or even the nature of, the J&W Investments. Testimony from Mr. Lange suggested it was a "dba" or sole proprietorship, some testimony suggested it was simply a bank account, some suggested it was a retirement fund, but the documentary record offered no good explanation. According to the trial balances or general ledger accounts, the J&W Investments "account" held $351,867.82 in property, the source or ownership of which the court is left to speculate about because the documentary record was inadequate to give a complete understanding. *See* Exh. 446.

During his testimony, Mr. Wickard testified that he is familiar with accounting practices, can read balance sheets and financial statements and related reports, and has been involved in sophisticated, multi-million dollar business transactions for years. In fact, he holds a degree in accounting. In addition, he and his enterprises employed a bookkeeping staff and retained outside accounting professionals. Given this sophistication and access to professional advice, and in the absence of evidence justifying the profound gaps in Mr. Wickard's financial records, the court concludes that the failure to keep records was not justified. *See* 11 U.S.C. § 727(a)(3).

Because Mr. Wickard failed to keep records from which his financial condition or business transactions might be ascertained, and because this failure is unjustified under the circumstances, the court finds that GECC has established its case for withholding his discharge under 11 U.S.C. § 727(a)(3).

B.    False Oath: § 727(a)(4)

As noted above, GECC also proceeded on a "false oath" theory premised on 11 U.S.C. § 727(a)(4).   To prevail under 11 U.S.C. § 727(a)(4)(A), a plaintiff is required to prove that the debtor "must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 352 (4th Cir. 2007).   The court finds that Mr. Wickard made several false statements in connection with his schedules and SOFA as detailed below.

1. Schedule B

The evidence presented at trial preponderated in favor of finding that Mr. Wickard held ownership interests in several assets and entities not disclosed on Schedule B.

Although Ms. Romero and Mr. Wickard both sought to persuade the court that Mr. Wickard held no interest in Advantage or NEITC, and that he acted for those entities simply for the convenience of Ms. Romero, the documentary evidence tells a different story.  The Advantage account ledger titled "Paid in Capital" (Account No. 3300) shows that Mr. Wickard made equity contributions in 2005 and 2006, reflected as such on the books of Advantage as late as April 2009.  *See* Exh. 407 (last page). An email exchange dated July 11, 2005 between Mr. Wickard and Ms. Davis corroborates Mr. Wickard's ownership interest in Advantage properties, where Mr. Wickard advised Ms. Davis that there would be "owner capital payments into . . . Adv" if needed to cover checks.  *See* Exh. 150. The fact that Ms. Davis directed such a question to Mr. Wickard rather than Ms. Romero is consistent with Mr. Wickard's having an ownership or "capital" interest in Advantage, contrary to the testimony of Mr. Wickard and Ms. Romero, which the court does not credit.

Other real estate and financial documents confirm that Mr. Wickard held himself out as "General Manager" of Advantage by signing a real estate sales agreement or extending a loan on its behalf, and as a "member" of NEITC by signing a financing statement and a commercial lease as a co-tenant, contrary to his testimony seeking to downplay his ownership and control over these entities. *See* Exh. 8, 151, 238 & 402.  Testimony from Ms. Romero and Mr. Wickard that his son and Ms. Romero owned and controlled NEITC was not convincing, particularly given Mr. Wickard's pervasive role in the financial life of the company. *See, e.g.*, Exh. 42, 45 & 50.

The court concludes, based on the documentary evidence and considering the credibility and weight to accord the testimonial evidence, that Mr. Wickard had ownership interests in Advantage and NEITC, yet failed to disclose either of them on Schedule B.

**Page 11 of 19**

Similarly with respect to Sterling Insurance, documentary evidence suggests that in February 2007, Mr. Wickard caused that company to redeem 10% of the shares of minority stockholder Matthew D. Clark for $3,677.49, and that Mr. Wickard retained 90% interest after the redemption and related transactions. *See* Exh. 217.  GECC reasoned that if 10% of the company was worth $3,677.49 in February 2007, 90% of that same company was likely worth more in December 2007, when Mr. Wickard sought bankruptcy protection.  Mr. Wickard's testimony attempted to persuade the court that the redemption price reflected a premium extended for reasons unrelated to the value of the enterprise. The court is not persuaded.

First, the Stock Redemption Agreement included as part of Exhibit 217 makes no reference to such other considerations, despite the integration clause at Section 6.2. Second, and more to the point, Mr. Wickard's testimony established at most that the redemption price was inflated, not that the company was worthless.  In fact, he testified that he needed Sterling Insurance to meet regulatory requirements for the insurance portion of his enterprises, suggesting that the company had some value.  Although he did disclose his 90% interest in this company on Schedule B, he valued the company at $1.00.

With respect to Phoenix Capital, ownership of which Mr. Wickard did disclose, GECC contends that Mr. Wickard deliberately undervalued that company on his schedules as worth $1.00, while representing higher values on various personal financial statements.  In response, Mr. Wickard drew a distinction between book value and market value.  After weighing the evidence, the court concludes that GECC has not established this aspect of its case by a preponderance of the evidence.  First, the distinction between book value and market value at least plausibly explains the differences between Schedule B and the personal financial statements.  Based on the personal financial statements which GECC assumes to be true, GECC

argues that Mr. Wickard understated the values his bankruptcy documents. It is equally plausible, however, that he overstated the values on his financial statements rather than understating them on his schedules.  And, although GECC offered "retroactive" opinions of value from Mr. Bovee and Ms. Blashfield (rendered in 2011 as of December 2007), the court assigns little weight to this *post hoc* evidence. Finally, as suggested by the credible testimony from Chapter 7 trustee Stephen Langeland, Mr. Wickard's valuation of Phoenix Capital may not have been misleading because of the extensive secured debts of that entity.  GECC did not meet its burden of proof in this respect.

## 2. SOFA

### a. **Question No. 1: Income from employment or operation of business**

Contrary to the instructions included with Question No. 1, Mr. Wickard failed to disclose his receipt of payments under the Western Star Notes—payments that continued for nearly two years after the petition date, until GECC prompted the Chapter 7 trustee to take action.  Evidence established that Mr. Wickard did not advise the makers of the Western Star Notes that he had assigned the notes to DMS, so they naturally continued making the checks payable to Mr. Wickard, who endorsed them and directed Ms. Davis to deposit them in the DMS accounts.

On his SOFA, he falsely indicated that he stopped receiving payments on these notes in April 2007. *See* Exh. 136 (SOFA at Question No. 2).  When pressed for an explanation at trial, he offered the fact that he assumed these were assigned to DMS as part of capitalizing that entity in January 2007, but of course the transfer that he used to explain the false statement in response to Question No. 2 is not itself disclosed in response to Question No. 10.  He suggested that he

relied, to his detriment, on Ms. Davis's help in preparing the schedules and SOFA, and the transfer evidently slipped his mind. The court finds the explanation incredible and inadequate.

Mr. Wickard is a sophisticated businessman who exerted considerable managerial control and oversight over the Wickard Companies and was intimately involved in the financial accounting for the entities. Email correspondence seeking his advice confirms his involvement. Given the central role that the PEO business played in the life of his companies, as well as the centrality of DMS in the PEO business, and given the badges of fraud surrounding the transfers into and out of DMS, the court does not credit his pretended innocence.

Moreover, his testimonial explanation invites the court to, in effect, approve the supposed delegation of his duties under § 521 to Ms. Davis, an invitation that the case law and common sense prevent the court from accepting. *In re Stoecker*, 114 B.R. 965, 977 (Bankr. N.D. Ill. 1990) (Section 521 prescribes certain non-delegable duties); *In re Baker*, 1990 WL 305559, *5 (Bankr. N. D. Ind.) (duties imposed by Section 521 are affirmative obligations of the debtor).

b. **Question No. 10: Other transfers**

Mr. Wickard's response to Question No. 10 lies at the heart of GECC's case. GECC contends that, contrary to the instructions accompanying Question No. 10, Mr. Wickard failed to disclose his transfer of the Western Star Notes and the OORC debt into DMS, and failed to disclose the transfer of his interest in DMS to Ms. Romero. Moreover, by indicating that he ceased receiving payments on the Western Star Notes in April 2007 without disclosing the transfers, he misleadingly created the impression that the Western Star Notes had no value, even though he continued to receive and endorse checks on account of the notes for almost two years after filing.

Just as he failed to disclose the transfer of his book of business into NEITC and later DMS, he also failed to disclose his transfer of his interest in DMS to Ms. Romero.

c. **Question No. 18:  Nature, location and name of business**

Question No. 18 from the SOFA presented additional support for a false oath finding under 11 U.S.C. § 727(a)(4).  This aspect of GECC's case revolves around Mr. Wickard's failure to list the following information:

> . . . the names, addresses, taxpayer-identification numbers, nature of the businesses, and beginning and ending dates of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case.

*See* Exh. 136 at p.6 (SOFA at Question No. 18).  In response to this question, Mr. Wickard omitted any reference to DMS (although he owned 100% in January 2007) or OORC or Sterling Insurance (Exh. 217 shows 90% ownership) or Advantage (held himself out as general manager, signed documents, approved loans from the company to at least one employee).

In his testimony, Mr. Wickard took pains to portray his role as solely that of "salesman" within the sales department of either NEITC or DMS, depending upon the timeframe.  He attempted, through his statements in court, to distance himself from a management role, frequently saying that he was simply carrying out Ms. Romero's orders regarding various NEITC and DMS transactions.  The documentary evidence, however, paints a very different picture.  *See In re Casa Nova of Lansing*, 146 B.R. 370, 373 (Bankr. W.D. Mich. 1992) ("In consideration of the credibility problems discussed below, the court prefers to rely on documents introduced into

evidence where possible."). The court does not credit Mr. Wickard's testimonial attempt to minimize his management or executive role in the various companies that comprised the family of companies bearing his name.

Similarly, Ms. Romero's testimony persuades the court that Mr. Wickard's testimony misrepresented the pervasive role he played in managing the "Wickard Companies," including NEITC, DMS, Phoenix Capital, OORC, and even Advantage.

For example, with respect to the undocumented transaction in which Mr. Wickard transferred his interest in DMS to Ms. Romero, he stated that he did so because he needed Ms. Romero's money to run the business and that she was at all times in the driver's seat. When Ms. Romero testified, however, she expressed very little understanding of the transaction or the company. Although she, like Mr. Wickard, testified that Mr. Wickard got her involved as putative owner of DMS because he needed her to fund the business, she could not recall whether she actually put any money into the business, and she agreed that she paid nothing for it.

### 3. Fraudulent Intent

So far, the court has found numerous omissions and questionable statements on Mr. Wickard's schedules, many of which Mr. Wickard concedes should have been reported more fully or accurately. Standing alone, omissions will not deprive a debtor of a discharge because, as noted above, the false statements (or omissions) must be made (or omitted) fraudulently and knowingly. *See* 11 U.S.C. § 727(a)(4). Because debtors rarely admit improper motives, courts facing questions of intent must draw inferences, or refrain from doing so, based upon the circumstances established at trial. *Keeney*, 227 F.3d at 684.

Although the court recognizes that this case is not, strictly speaking, a fraudulent conveyance action, the badges of fraud analysis provides a helpful paradigm in which to ferret out a debtor's intent under 11 U.S.C. § 727(a)(4), as Defendant's counsel conceded during closing arguments. *In re Halishak*, 337 B.R. 620, 631 (Bankr. N.D. Ohio 2005) (failure to disclose items in which debtors retained a beneficial interest is traditional badge of fraud and warrants denial of discharge pursuant to § 727(a)(4)); *In re Boba*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002) (same badges of fraud that apply to cases under § 727(a)(2)(A) apply to analysis under § 727(a)(4)). After reviewing documents and assessing the demeanor and credibility of the witnesses, the court finds that the evidence preponderates in favor of drawing an adverse inference against Mr. Wickard in connection with his numerous schedule-related misstatements and omissions.

With respect to the central omission in this case—the failure to disclose the transfer of the Western Star Notes to DMS and the failure to disclose the transfer of Mr. Wickard's interest in DMS to Ms. Romero—the court regards the omission as a continuation of prepetition conduct marked by numerous badges of fraud. As a result of this omission, Mr. Wickard continued to receive payments on the Western Star Notes for nearly two years after the petition date, payments that he used to prop up the businesses he controlled before and after the petition.

GECC established through Mr. Wickard's testimony and through documentary evidence that it sued Mr. Wickard on September 11, 2006, on a commercial guaranty. Shortly after service of the complaint in that action, Mr. Wickard formed DMS with the intention of transferring his book of business to that entity, and in fact shifted the PEO business from NEITC to DMS. He also transferred the Western Star Notes to DMS. Such transfers, following closely

after commencement of litigation and effected without apparent documentation, bear the hallmarks or badges of fraud.

Shortly after forming DMS, testimony established that he transferred his interest in the newly formed entity to Ms. Romero—his long-time girlfriend and a classic insider—for no consideration, thereby revealing two more badges of fraud. Following the transfer of the Western Star Notes and the stock of DMS, he continued to control and enjoy the benefits of both assets, establishing yet another classic badge of fraud.

Finally, despite a statutory obligation to disclose the transfers on his SOFA, he failed to disclose the transfer of the Western Star Notes (except, perhaps, obliquely by suggesting falsely that payments stopped in April 2007) and his interest in DMS. By suggesting that the payments on the Western Star Notes ceased in April 2007 but not disclosing the assignment to DMS that he later pointed to as the explanation for reporting the cessation of payments, he created the misimpression that the assets lacked value. When the court couples that false impression and other facts and circumstances adduced at trial, with the undisputed fact that Mr. Wickard continued to receive checks on account of the Western Star Notes for almost two years post-petition and that he directed the proceeds of those checks to entities he controlled, the court infers that he did so fraudulently and willfully.

More generally, the court strongly doubts Mr. Wickard's credibility mostly because it is consistently at odds with the other evidence, especially the documentary evidence. At trial, he attempted to persuade the court that he was simply a salesman for the various entities, including NEITC and DMS at various times, but the documentary evidence establishes his pervasive control over the entities included within the so-called Wickard Companies.

In fact, the evidence revealed frequent instances in which Ms. Davis, his son and others consulted him about minute details of the various businesses and assets, including many that he said belonged to Ms. Romero alone. His testimony unsuccessfully sought to create the impression that he was just following Ms. Romero's orders. Yet, when Ms. Romero testified, she denied knowledge about many of the transactions and businesses at issue. Even allowing for a witness's natural trepidation about testifying in court,[4] neither her testimony nor her demeanor would support any inference that she was "calling the shots" with respect to the businesses within Mr. Wickard's commercial empire. In point of fact, in the few instances in which she was able to recall specific details, her testimony seemed rehearsed. For example, she had no difficulty recalling that she was out of town visiting family when Mr. Wickard signed a multi-million dollar lease on behalf of NEITC,[5] yet on cross-examination about specific transfers at the heart of this case, her testimony was indefinite and entirely too general to corroborate Mr. Wickard's pretense that Ms. Romero was actually the person in charge of the management of the various Wickard Companies.

### 4. Other Contentions

The court has considered GECC's other contentions regarding inadequate or misleading disclosures and finds that GECC offered insufficient evidence at trial to merit relief based upon statements or omissions other than those described more fully above.

---

[4] At closing argument, Mr. Wickard's counsel compared Ms. Romero's demeanor to that of a "deer in the headlights."

[5] *See* Exh. 8.

## IV. CONCLUSION

Based on the record adduced at trial, the court concludes that Mr. Wickard failed to keep adequate records from which interested parties might ascertain his financial condition and business transactions, and compounded that failure by knowingly and fraudulently making false statements in his schedules and especially his statement of financial affairs. "Complete financial disclosure is a prerequisite to the privilege of discharge," but Mr. Wickard's disclosures in this case fell far short of the mark. *See Keeney*, 227 F.2d at 685 (internal quotations and citations omitted).

For these reasons, the court will enter judgment for GECC denying Mr. Wickard a discharge under 11 U.S.C. § 727(a)(3) and (a)(4).

**IT IS SO ORDERED.**

Scott W. Dales
United States Bankruptcy Judge

**Dated: August 03, 2011**